## In re FEATHERWORKS CORPORATION, Debtor.

### Bankruptcy No. 181–10650–21.

United States Bankruptcy Court,
E.D. New York.

Dec. 20, 1982.

Finkel, Goldstein & Berzow, New York City, for debtor; Harold S. Berzow, New York City, of counsel.

Louis P. Rosenberg, Brooklyn, N.Y., for Far West Garments, Inc.; Alfred A. Rosenberg and Richard L. Koral, Brooklyn, N.Y., of counsel.

Kerwin & Elliott, pro se; Thomas J. Kerwin, Denver, Colo., of counsel.

Wachtell, Lipton, Rosen & Katz, New York City, for Walter E. Heller & Co. (Inc.); Theodore Gewertz, New York City, of counsel.

## OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

Pending before this Court are a number of motions relating to the voting on the debtor's plan of reorganization and to the confirmation of that plan. Other motions concern related matters. Because an appeal is pending with respect to one aspect of these interrelated matters, the Court has delayed decision on them. However, for reasons which shall become clear, the Court has belatedly concluded that in fairness to the parties and to the appellate court, all pending matters should now be resolved to the extent possible so as to avoid further piecemeal appeals.

This proceeding, which this Court had assumed to be merely ancillary to the reorganization in bankruptcy of the debtor's parent, has taken on unexpected complexity, requiring a rather lengthy recapitulation of the background facts. To put the pending motions into context, some brief description of the parties involved and a brief summary of the proceedings to date are necessary.

## I.

### THE PARTIES

The debtor, *Featherworks Corporation* ("Featherworks"), is a Colorado corporation. Its business is the buying, selling, and processing of feathers and down. It conducts its business at premises it owns at 4410 Washington Street, Denver, Colorado. Featherworks is the wholly-owned subsidiary of Puro Down International of New Jersey Corp., which was formerly known as *Hudson Feather & Down Products, Inc.* (and which will be referred to hereinafter as "Hudson"), which is engaged in the same business as Featherworks.

Hudson is owned by Puro International, Ltd., a New York corporation, which, in turn, is owned by *Windsor Trading Corporation* ("Windsor"), which belongs to Arthur Puro's wife and daughter (Tr., 7/27/82, at 43). *Arthur Puro* is the president and chief operating officer of both Windsor and Hudson (Tr., 7/27/82, at 43), and since at least January, 1980, has been in control of the debtor, Featherworks.

Hudson and Windsor are the debtor's largest creditors. The debtor's schedules show a debt to Hudson of $1.4-million and to Windsor of over $5-million, of which $1-million is described as secured and the balance as unsecured. In addition, Windsor has a post-petition claim against the debtor for over $2-million (Tr., 5/26/82, at 83).

*Far West Garments, Inc.* ("Far West") is a former customer of Featherworks. It is a manufacturer of products employing feathers and down. On May 28, 1980, Far West was awarded a judgment against Featherworks for damages due to breach of warranty in the amount of $384,577. This Chapter 11 proceeding was precipitated by a sheriff's sale of Featherworks' real property scheduled to take place on March 3, 1981 in execution of that judgment. Far West is the debtor's second largest unsecured creditor, excluding companies affiliated with the debtor.

In the litigation with Far West, Featherworks was represented by the Denver law firm of *Kerwin and Elliott,* which served as general counsel to Featherworks from around 1976 until their retention was terminated by Arthur Puro around September, 1980. They have an unpaid claim against Featherworks for legal services in the amount of $33,287.44, making them one of the debtor's largest unsecured creditors.

*Walter E. Heller & Co. (Inc.)* ("Heller") was financing Featherworks up to the time it filed its petition for relief. At the time Featherworks filed, Heller was owed in excess of $5,000,000 secured by a lien on Featherworks' inventory and accounts receivable. Heller ceased all further financing when Featherworks filed. Its security has fallen short of paying off the amount owed it by approximately $1.5-million, making Heller an unsecured creditor in that amount. (Certification as to Balloting With Respect to Plan of Reorganization, at 3 (5/19/82)).

## II.

### THE PROCEEDINGS TO DATE

Featherworks filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code on February 26, 1981, pursuant to 11 U.S.C. § 1102. Its schedules identified Arthur Puro as its president and described the debtor as a subsidiary of Hudson, which owned 100 percent of its common stock. At the time, Hudson was itself in reorganization in this Court. Although the debtor's schedules showed debts in excess of $12.5-million, most of these debts, with the exception of what was unpaid Heller, Hudson, Windsor, and Far West, were small. Half the creditors listed were owed less than $1,000 each. The

Court appointed a committee of creditors consisting of the seven largest unsecured claims, except that it did not include as a member of that committee Kerwin and Elliott, which would have qualified by reason of the size of its claim. Kerwin and Elliott is now applying to be added to that committee which so far has been inactive.

On March 27, 1981, the Court issued an order lifting the automatic stay so as to permit Heller (which had ceased financing Featherworks on the filing under Title 11) to collect on its security, consisting of the debtor's pre-petition inventory and accounts receivable. Heller was then owed over $5-million.

After Heller ceased financing Featherworks, its financing was taken over by Windsor. After notice and a hearing, the Court entered an order on September 25, 1981 giving Windsor a priority administration claim for any merchandise sold and delivered to the debtor-in-possession subsequent to the filing of the Chapter 11 petition, and a first lien and security interest upon the debtor's inventory and accounts receivable, subject to the prior lien of Heller, with respect to any indebtedness incurred *subsequent* to August 3, 1981.

On October 30, 1981, the debtor filed a proposed plan of reorganization. The plan is a very simple one, under which all general unsecured creditors, all of whom are placed in Class II, will share in a lump-sum distribution of $40,000 to be supplied by Windsor. Windsor, it was indicated, will waive participation on its $4-million unsecured claim so that creditors would receive 1.3 percent each on confirmation. Priority creditors, including unspecified administration creditors, are put in Class I and are to be paid 100 percent on confirmation. Their claims are approximated to be $21,000, and at the hearing on confirmation, Puro stated that they would be paid by Windsor (Tr., 5/26/82, at 83). The debtor's secured creditors are put into two classes—Classes III and IV: Class III consists of the single pre-petition secured claim of Heller. Heller is to be given title, as well as possession, of all the debtor's inventory and accounts re-

ceivable in satisfaction of its secured claim. The debtor estimated that that would leave Heller with an unsecured claim of approximately $1-million, which will fall into the Class II category. (In fact, Heller's unsecured claim is closer to $1.5-million.) Class IV is composed of the debtor's unsecured creditors whose interests are unimpaired. In this class are put First American Mortgage Company, which holds a first Deed of Trust on the debtor's real estate on which there was a balance due at the time of filing of $157,851; Guy G. Joseph, who holds a second Deed of Trust in the face amount of $250,000; and Windsor, which has liens, both pre- and post-petition, on the debtor's machinery, equipment, inventory, and accounts receivable.

The Court fixed March 30, 1982 both as the date for a hearing on the acceptances of the plan of reorganization, and as the last day for the filing of written acceptances or rejections to that plan.

On March 30, 1982, it appeared that the debtor, although it had received 23 acceptances, lacked the votes to confirm the plan unless it was able to count the votes of Hudson and Windsor. The plan had been rejected by Heller, Far West, Kerwin and Elliott, and three other creditors.

Far West contended that the debtor's plan could not be confirmed because 11 U.S.C. § 1129(a)(10) requires that there must be a class of creditors, without including insiders, who have accepted the plan, and that the votes were lacking for confirmation if the acceptances of Hudson and Windsor were excluded. The Court put off determining that issue and proceeded with the hearing on confirmation.

When that hearing resumed on May 26, 1982, Heller moved for an order pursuant to § 1126(a) of the Bankruptcy Code to allow it to change its ballot and to vote to accept the amended plan of reorganization. Subsequently, Far West cross-moved for an order disqualifying that acceptance in accordance with 11 U.S.C. § 1126(e) and notifying the United States Attorney that an investigation should be had to determine whether a violation of 18 U.S.C. § 152 has taken

place. The alleged violation consisted of the receipt by Heller of $25,000 from Windsor coincidentally with the attempted change in its vote. The Court, without deciding whether or not Heller could change its vote, changed the cut-off date for voting for all creditors to June 15, 1982. During the extended period, no creditor changed its vote. This extension of the date for voting has been appealed, and that appeal is now pending.[1] Despite the appeal, the Court continued with the hearing on confirmation of the amended plan; that hearing was concluded on July 27, 1982.

The debtor is urging in support of confirmation that creditors are receiving as much as they would if the debtor were liquidated. Far West disputes this, and also opposes confirmation of the plan on the ground that it has not received the acceptance of a class of creditors as required by § 1129(a)(10).

On March 26, 1982, Kerwin and Elliott filed an objection to the claim of Windsor and asked that Windsor's claim be entirely disallowed or subordinated to those of all other creditors. Hearings on their objection were held on May 26, June 7, and July 27, 1982.

After these various hearings were concluded, Far West, following a number of false starts, moved, pursuant to Bankruptcy Rules 734 and 737, for an order directing the debtor to permit access to its premises at 4410 Washington Street, Denver, Colorado, for the purpose of inspecting and appraising the debtor's real property.

Accordingly, now pending before the Court are Kerwin and Elliott's motion to be added to the creditors' committee; the motion and cross-motion with respect to Heller's application to change its vote; Kerwin and Elliott's motion to disallow or subordinate Windsor's claim; Far West's motion to appraise the debtor's real estate; and, overarching all else, the question whether the debtor has demonstrated that its plan meets the requirements of 11 U.S.C. § 1129 for confirmation.

These various matters and the facts relevant to each will be examined separately.

### III.

### THE DEBTOR'S PLAN

11 U.S.C. § 1129 lays down the requirements for confirmation of a plan of reorganization. Among the requirements with respect to acceptance of a plan are those found in subsections (a)(10) and (a)(7)(A)(ii). Subsection (a)(10) reads as follows:

"At least one class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim of such class."

11 U.S.C. § 1129(a)(7) requires that unless each member of a class has accepted the plan, each holder of a claim in that class "receive * * * under the plan * * * property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive * * * if the debtor were liquidated under Chapter 7 * * * on such date."

### A. *The Plan Does Not Satisfy § 1129(a)(10)*

The debtor's plan lacks the necessary acceptances because the votes of Windsor and Hudson must be excluded and Heller will not be permitted to change its vote.

### 1. *The Votes of Hudson and Windsor Do Not Count*

■ Section 1129(a)(10) disenfranchises insiders and explicitly directs that in determining whether a class of claims has accepted a plan, there cannot be included "any acceptance of the plan by any insider." Section 101(25) defines an "insider" for purposes of Title 11 as including "if the debtor

---

1. The issue on appeal is "did the bankruptcy court err in entering an order reopening and extending the time for voting on the plan which effectively cured the untimeliness of the last accepting vote." If the appellate court should decide that the bankruptcy court erred, the conclusion now reached by the bankruptcy court that Heller will not be permitted to change its vote becomes unnecessary. The vote change would be barred because subsequent to the original bar date, March 30, 1982.

is a corporation," the "person in control of the debtor."

There can be no question but that with regard to the debtor, both Hudson and Windsor are insiders. Featherworks is a wholly-owned subsidiary of a chain of corporations of which Hudson is a link and Windsor is the apex. The debtor, in its disclosure statement, describes Windsor as "an affiliated company of the debtor in that it has the same officers and directors and controls the debtor's equity interest." Amended Disclosure Statement, at 6 (2/26/82).

■ Windsor argues that the disqualification of an insider should be determined as of the time the claim came into existence, not as of the time of the vote. It is Windsor's position that its claim came into existence before it became an insider. Just when Puro and, therefore, Windsor was able to exert sufficient control over the debtor to qualify as an insider is a disputed issue of fact which it is not necessary to resolve at this time because this Court is persuaded that what determines the right to vote is the status of the creditor at the time the vote is taken, not at the time the debt arises.

The purpose of the vote is to secure an expression from the creditors of where they think their best interest lies. An insider, like Hudson and Windsor, does not have the same interest as the creditors. The creditors will benefit only to the extent of their distributive share in the $40,000 to be paid out by Featherworks; Hudson and Windsor will benefit by retaining effective ownership of a functioning company which has been freed of all outstanding debts in payment for that $40,000. Hudson and Windsor are influenced by totally different considerations from those motivating the other creditors of Featherworks. The policy considerations underlying the disqualification of insiders apply most strongly to them. Their votes cannot be counted for purposes of § 1129(a)(10).

This conclusion is reinforced by the facts peculiar to this case.

### B. Windsor Is Not a True Member of the Class

■ In opposing Kerwin and Elliott's motion to equitably subordinate Windsor's claim, the debtor has taken the flat position that Windsor would not participate in the $40,000 to be distributed among general creditors (Tr., 5/28/82, at 18). Thus, when Windsor declares itself to be in favor of the acceptance of the plan, it is voting for what persons other than itself would be satisfied to receive. Windsor has taken itself out of Class II. To permit it to impose its will on the debtor's true general creditors by creating a false majority in favor of the plan is inconsistent with the proper operation of the Code.

### C. Heller's Acceptance Is Ineffective

■ If the votes of Hudson and Windsor cannot count towards acceptance of the plan, then the plan lacks the necessary votes unless Heller's motion for leave to change its vote is allowed. (As already noted, should the District Court decide that the bankruptcy court lacked the power to extend the time for voting, Heller will necessarily be bound by its pre-March 30, 1982 rejection.) In support of its application for authority to change its vote, Heller has explained that it had been prepared to vote for the debtor's plan until sometime before March 30, 1982, when it took possession of and sold the debtor's remaining pre-petition inventory. It then discovered that the inventory was inferior in quality and weight to what it had been represented to be. Heller then decided both to reject the debtor's plan, and allegedly threatened to sue the debtor, Windsor, and Puro. Allegedly to avoid litigation, Puro paid Heller $25,000, receiving in return the assignment of certain accounts receivable and the exchange of general releases running to himself and Windsor. The attorneys for the parties drafted the necessary papers, and on May 19, 1982, the same date that the agreements were executed, Heller advised the debtor of its change of vote.

11 U.S.C. § 1126, which lays down the rules governing acceptance of a plan, authorizes disqualification of a vote for lack of good faith. Subsection (e) of that section provides:

"On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title."

Relevant to giving content to this section is 18 U.S.C. § 152, which makes it a criminal offense punishable by a fine or imprisonment for not more than five years, or both, to give or receive money for taking or forbearing to take any act in connection with a proceeding under Title 11 when done fraudulently and willfully.

Although Heller stoutly maintains that the change in its vote was not influenced by the contemporaneous receipt of $25,000 from Windsor, the timing and the surrounding circumstances are at least suspect. Until Heller received the $25,000, it was voting against the plan; afterwards, it changed position.

When Heller earlier indicated to Featherworks' counsel that it would accept the debtor's plan, it was expected, according to the disclosure statement, that it would have an unsecured claim of about $1-million which would share in the $40,000 made available to general unsecured creditors. According to the most recent figures available to the Court, Heller's unsecured claim is now $1.5-million. Thus, the discovery by Heller that the collateral was less valuable than it had believed, making its unsecured claim greater, bore directly on the acceptability of the total distribution to all unsecured creditors of $40,000. In these circumstances, to receive an additional $25,000 might have made the plan marginally more acceptable. Looking to the source of the $25,000, it is self-evident that Windsor and Puro had a strong interest in putting through a plan which leaves them in total ownership of Featherworks, free of all debts, in exchange for the relatively small sum of $40,000.

The bankruptcy laws extend extraordinary relief to insolvent debtors by permitting them to slough off their debts and continue in operation, provided their creditors agree to that course of action. The Code depends upon the self-interest of the creditors to act as a barrier against abuse of the bankruptcy laws. If a majority in number and amount of all creditors vote for a plan, there is good reason to believe that that plan is in the best interest of all creditors, since it would not receive such a vote otherwise. However, if any creditor receives some special consideration peculiar to him, his vote is no longer disinterested and unbiased and the Code's built-in controls are neutralized.

Bearing in mind all the circumstances, the Court will not permit Heller to change its vote on the plan from rejection to acceptance. The Court does not believe such acceptance to have been solicited, procured, or given in good faith when the total amount to be received by all unsecured creditors is only $40,000. A change in vote by the debtor's major unsecured creditor, coincidental with the receipt from the same source as the $40,000 funding the plan of an additional $25,000 over and above what other creditors are receiving, will not be allowed.

The Court does not know enough with respect to what occurred to find, as Far West requests, that there are reasonable grounds for believing that there has been a violation of 18 U.S.C. § 152 and to refer the matter to the United States Attorney pursuant to 18 U.S.C. § 3057.

Whatever either Heller or Puro did was apparently done with the advice and knowledge of their respective attorneys, who are among the most respected lawyers appearing in this Court. It has long been recognized with respect to other types of violations of 18 U.S.C. § 152 that acting on the advice of counsel negates the presence of the necessary fraudulent intent. *E.g., Thompson v. Eck,* 149 F.2d 631, 633 (2d Cir.1945).

Since the debtor's plan has not been accepted by the requisite number of creditors, it cannot be confirmed even if it satisfied § 1129(a)(7)(A)(ii).

### D. *The Record Fails to Establish That Creditors Will Receive As Much As On Liquidation*

■ Far West opposes the plan not simply because it has failed to gain acceptance from a class of creditors, as required by § 1129(a)(10), but also on the ground that creditors will not receive under the plan as much as they would in a Chapter 7 liquidation. Far West does not dispute that the debtor's pre-petition inventory and accounts receivable are covered by Heller's security interest, and that Heller is owed more than the value of this collateral. Far West, however, claims that the debtor's building has a value higher than the $275,000 which the debtor attributes to it, and it also suggests that the second Deed of Trust in the face amount of $250,000 could be satisfied on liquidation by the payment of $125,000. If Far West were right as to either, or both, the debtor would have a substantial equity, well in excess of $40,000, in its real estate which would be available to its creditors on liquidation.

Far West also believes that the post-petition operations of the debtor have generated assets which would be available to the creditors on liquidation. According to the debtor, its post-petition inventory and accounts receivable would, if liquidated, not realize enough to cover the administration claim of Windsor. Far West urges, however, that Windsor's administration claim is suspect because of the enormous jump it took between the date of the figures on the disclosure statement, August 31, 1981, and the date of the hearing on confirmation, March 30, 1982. It increased about $676,000, principally for the purchase of raw materials, but this increase was not matched by any corresponding increase in either the debtor's inventory or accounts receivable, which together rose only around $180,000. As Far West points out, if the inventory and accounts receivable failed to keep pace with purchases because of cash sales, there should have been a change in the debtor's indebtedness, whereas its operating statements show a break-even operation.

As the proponent of the plan, the debtor had the burden of establishing that it met the requirements of the Code. Critical to that issue is the present value of its building and the totality of encumbrances on it. The only evidence submitted by the debtor with respect to the value of the building was an appraisal made in September, 1980, *i.e.,* more than two years ago, which put the value of the building at $275,000. It now develops that this appraisal was made in connection with the settlement of the litigation with Guy G. Joseph, which may affect its trustworthiness. In any event an appraisal two years old in the volatile real estate market this country has been experiencing over the past few years cannot be deemed probative of its present value.

The lack of reliable evidence in the record on this score is the more critical because of the substantial question which has been raised as to what would be left for creditors in the event of a forced liquidation of the debtor's building. Far West does not question the first Deed of Trust held by First American Mortgage Company, of which there was a balance due at the time of the filing of the Chapter 11 of approximately $157,851, a figure which now must be lower, but Far West does query the second Deed of Trust in the amount of $250,000 held by Guy G. Joseph. This lien came into being as the result of a stipulation entered into on September 9, 1980 settling an action brought by Guy G. Joseph against Featherworks and Morris Schachne. This stipulation has been supplied this Court by Far West. (Exhibit B to Memorandum of Far West in Opposition to Confirmation, filed August 4, 1982.) The parties to this stipulation were Guy G. Joseph, Featherworks, Windsor, and Arthur Puro. Pursuant to the stipulation, the complaint against Schachne was dismissed, and judgment was entered against Featherworks in the amount of $256,000 which was to be satisfied by the payment by Windsor or Puro

over a five-year period of $125,000 with interest at 10 percent, of which $50,000 was to be paid on September 4, 1980. Payment was to be secured by a judgment lien in the form of a second Deed of Trust in the sum of $256,000 in favor of the plaintiff on Featherworks' real property, which was to be assigned to Windsor on payment in full of the $125,000.

On the hearing on Kerwin and Elliott's motion to subordinate Windsor's liens and claims, Mr. Kerwin claimed that the settlement with Joseph was deliberately structured to take advantage of a pre-judgment attachment which Joseph had secured, so as to take precedence over the judgment Far West had obtained earlier that year in May, 1980 (Tr., 7/27/82, at 27). Whatever the *bona fides* of the second Deed of Trust, it would appear that there are strong grounds for believing that its true amount is $125,-000, or less, so that in the event of liquidation, any value in the debtor's real estate in excess of $282,000 ($157,851 + $125,000) would be available to creditors. In these circumstances, that the property was worth no more than $275,000 two years ago cannot be deemed acceptable proof that creditors would receive nothing if the property were liquidated today.

Because it is clear that further proceedings will have to be had herein, nothing said herein with respect to the second Deed of Trust held by Guy G. Joseph should be deemed final or to result in law of the case. The full facts respecting that second Deed of Trust will have to be explored more fully in proceedings to which Guy G. Joseph may well have to be made a party.

Since the insufficiency of the record as to the current value of the debtor's building precludes a finding that the debtor has demonstrated that its plan satisfies § 1129(a)(7), it is unnecessary to evaluate the significance of the curious rise in the debtor's post-petition debt without any corresponding increase in its assets.

For the reasons stated, the debtor has failed to make a positive showing that the plan provides at least as much as liquidation would yield.

## IV.

## THE KERWIN AND ELLIOTT MOTIONS

Two motions by the debtor's former attorneys, Kerwin and Elliott, are pending. First, Kerwin and Elliott want to be added to the creditors' committee; second, they are seeking to disallow, or subordinate, Windsor's claims and liens.

These motions have brought into sharp focus the effect of the attorney-client privilege on the activities of a lawyer-creditor in a bankruptcy proceeding of his former client. Under what disabilities, if any, does a lawyer labor? May he become a member of the creditors' committee? May he use knowledge obtained as a lawyer to his client's disadvantage in support of a motion for equitable subordination?

That Kerwin and Elliott served as attorneys for the debtor is common ground; its claim arises out of services performed in that capacity. In 1976 or 1977, the firm was retained by Morris Schachne to advise and represent Featherworks and continued to do work for the debtor until sometime in 1980 (Tr., 7/27/82, at 23, 19–21). The change in the persons in control of the corporation, with Puro replacing Schachne, did not terminate the attorney-client privilege. That privilege belongs to the corporate client and not to the individual officers or directors, and passes by operation of law to the trustee in bankruptcy or, as here, to the debtor-in-possession. *Citibank, N.A. v. Andros,* 666 F.2d 1192 (8th Cir.1981); *In re O.P.M. Leasing Services, Inc.,* 13 B.R. 64, 67–68 (Bkrtcy.S.D.N.Y.1981).

The debtor has not invoked the privilege in connection with Kerwin and Elliott's application to serve on the creditors' committee, but has raised it with respect to Mr. Kerwin's testimony in support of the firm's motion to subordinate Windsor's liens.

The governing principles are well-settled. Canon 4 of the American Bar Association's Code of Professional Responsibility states: "A lawyer should preserve the confidences

and secrets of a client." *N.Y.Jud.Law* app. § 15 Canon 4 (McKinney 1976 & Supp. 1982). The commentary notes: "The obligation of a lawyer to preserve the confidences and secrets of his client continues after the termination of his employment." *Id.,* EC 4–6. It adds: "A lawyer should not use information acquired in the course of the representation of a client to the disadvantage of the client, and a lawyer should not use, except with the consent of his client after full disclosure, such information for his own purposes." *Id.,* EC 4–5. An exception to this flat prohibition is where a lawyer goes unpaid: a lawyer may reveal confidences and secrets where it is necessary to do so in order to establish or collect his fee. *Id.,* DR 4–101(C)(4).

### A. *The Creditors' Committee*

Under the Code, as was not true under its predecessor, the Bankruptcy Act, the Court appoints the creditors' committee in a reorganization proceeding. 11 U.S.C. § 1102(a)(1) directs the Court to appoint a committee of creditors holding unsecured claims as soon as practicable after the order for relief is entered. Section 1102(b)(1) provides that the committee of creditors appointed by the Court:

> "shall ordinarily consist of the persons, willing to serve that hold the seven largest claims against the debtor of the kinds represented on such committee, or of the members of a committee organized by creditors before the order for relief under this chapter, if such committee was fairly chosen and is representative of the different kinds of claims to be represented."

As is evident from the language of the section, the Court need not necessarily appoint the persons that hold the seven largest claims, since all the statute provides is that the committee shall "ordinarily consist" of such persons. The authoritative House Report describes the language in subsection (b) as "precatory." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 401 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. The exercise of discretion is necessary.

Because the Court was aware from the Hudson proceeding that Kerwin and Elliott had been the debtor's attorneys, the Court, in the exercise of its discretion, did not appoint that firm to the creditors' committee. To the Court it seemed that to include a debtor's former attorneys in the creditors' committee might result in a conflict of loyalties: on the one hand, the debtor's creditors would depend on the committee and its members for guidance in such matters as whether to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan" (11 U.S.C. § 1103(c)(2)); on the other hand, the attorney might be inhibited from giving such guidance by his obligation to preserve the confidences and secrets of his client. It seemed unfair to Kerwin and Elliott that to place them in a position where their duty to the debtor's creditors might conflict with the duty they owed their former client to preserve the confidences and secrets to which they became privy in their position as attorneys. Furthermore, the Court did not deem it necessary for Kerwin and Elliott to be members of the creditors committee in order to establish or collect their fee. Accordingly, the Court did not include Kerwin and Elliott on the creditors' committee.

Paragraph (c) of § 1102 authorizes the Court, on request of a party in interest and after notice and a hearing, to change the membership or size of a committee appointed under subsection (a) "if the membership of such committee is not representative of the different kinds of claims or interests to be represented."

■ Kerwin and Elliott have moved under this provision to be added to the committee. Featherworks has not opposed the request for the reasons which led the Court originally to exclude Kerwin and Elliott from the committee. It has not claimed that membership is inconsistent with the former attorneys' client relationship. Since the privilege is lost unless it is claimed, it

can now be deemed waived insofar as it bars Kerwin and Elliott from sitting on the committee. Featherworks puts its opposition on the grounds that the application is late; confirmation is imminent; adding Kerwin and Elliott to the committee would create an even-numbered membership, leading to deadlock; Kerwin and Elliott are not prejudiced by their exclusion; and their claim is disputed. The last ground appears no longer to be present, since Featherworks stated on the record that it is not disputing that claim (Tr., 7/27/82, at 6).

As for the other grounds, the Court finds them unpersuasive. Confirmation of that plan is no longer imminent, and while Kerwin and Elliott's motion may be tardy, they advised the Court informally, almost immediately following the filing of Featherworks' petition, of their wish to be included on the creditors' committee.

Since the committee is not functioning and seems unlikely ever to function because of the insignificant nature of the claims of most creditors, whether Kerwin and Elliott becomes a member appears to be of little practical significance, nevertheless Kerwin and Elliott will be added to the creditors' committee.

## V.

## EQUITABLE SUBORDINATION

Although Featherworks has not raised the attorney-client privilege in opposition to the application of Kerwin and Elliott to be made a member of the creditors' committee, Featherworks has invoked it with respect to the testimony Mr. Kerwin offered respecting what he had learned during his representation of Featherworks; in particular, in connection with the settlement of the Guy G. Joseph litigation.

Since it can be expected that the issue will recur in this case, and since both sides have advised the Court that whatever the outcome of the present motions, there will be an appeal, the Court wishes to set down what it believes the governing law to be so that if the Court is in error, it can be corrected.

While this Court originally took a different position, it has now concluded that the attorney-client privilege cannot be invoked by Featherworks to prevent Mr. Kerwin from giving any testimony he deems necessary to establish that any distribution to Windsor, and, likewise, any liens securing Windsor's claims, must be subordinated to the payment of the debtor's general creditors, including his own claim.

As has already been noted, the relevant canon releases an attorney from the obligation of respecting his client's confidences to the extent necessary to establish and collect his fee. While it may be true that the claim owed Kerwin and Elliott is no longer disputed, so that its establishment is not in question, the ability of Kerwin and Elliott to *collect* on that fee will depend upon what monies there are available for distribution, and who shares in that distribution. By disallowing, or subordinating, Windsor's claims and liens, Kerwin and Elliott enlarge the amount available for distribution to Featherworks' other creditors, including themselves.

Accordingly, the Court has concluded that all the evidence adduced by Kerwin and Elliott was admissible, despite Featherworks' invocation of the attorney-client privilege, because disallowance or subordination of Windsor's claims, or liens, would benefit the general unsecured creditors. The Court does not believe this conclusion to be affected by the fact that with respect to the only distribution presently in contemplation, the $40,000 to be distributed by Windsor, Windsor has declared its intention not to participate. The eligibility of that plan to confirmation depends on the validity of Windsor's liens. If those liens were invalid, not only would the plan not qualify for confirmation, but general creditors could be certain, in the event of a liquidation, of receiving more than the plan now offers. For these reasons, Kerwin and Elliott are not inhibited by the attorney-client privilege from offering whatever evidence was available to them that would enable them to collect the amount which Featherworks concedes to be owed them. As the

hearing of July 27, 1982 will show, the Court invited Mr. Kerwin to present whatever evidence was available, reserving the right to seal the record, if necessary (Tr., 7/27/82, at 20–21).

## VI.

### DISALLOWANCE OR SUBORDINATION OF WINDSOR'S CLAIMS AND LIENS

Windsor, in August, 1978, was given a lien by the debtor on all its machinery and equipment in connection with the debtor's guarantee of the debts of its parent, Hudson, to Windsor; Windsor has a pre-petition claim against the debtor for $5-million, of which $1-million is described as secured and the balance is unsecured; Windsor also has a post-petition administration claim which fluctuates, but which was in excess of $2-million at the confirmation hearing.

Kerwin and Elliott's objection to Windsor's claim appears to be directed solely against Windsor's pre-petition claim and its August, 1978 lien. Kerwin and Elliott seeks to have Windsor's pre-petition claims disallowed in their entirety, or to be equitably subordinated to all other claims. Objection to Allowance of Claim of Windsor Trading Corp., Or, Alternatively, Motion to Equitably Subordinate Said Claim, at 2.

When this motion was filed, the only distribution to general creditors which was contemplated was the $40,000 as to which Windsor had agreed to waive participation. Accordingly, Windsor urged that there was no need for this Court to subordinate Windsor's claim since Windsor has already agreed to such treatment. In addition, Windsor entered a general denial and pleaded affirmatively that its August, 1978 lien was created at a time when Windsor had no control over the debtor corporation.

Mr. Kerwin called himself and Morris Schachne as witnesses. Morris Schachne had owned Hudson and its subsidiary, Featherworks, until January, 1980. On November 8, 1978, when Hudson was indebted to Windsor for nearly $5.5-million, it filed for relief under Chapter XI of the Bankruptcy Act of 1898. What occurred next is reflected in an Opinion of this Court, dated March 16, 1981, in the *Hudson* proceeding:

"[T]he Chapter XI proceedings were dominated to a great extent by a dispute between Hudson and Windsor Trading Corporation ("Windsor"). Lawsuits involving claims of usurious transactions, preferential payments, and the validity of Windsor's security interests in Hudson's property were commenced between Windsor and Hudson in the bankruptcy court, the United States District Court, and the New York State Supreme Court.

"The dispute was ultimately settled in *February, 1979* when the parties entered into an agreement whereby Arthur Puro, the controlling officer of Windsor, was given joint managerial control over Hudson with Mr. Schachne. This agreement remained in effect until *January, 1980,* when Mr. Schachne resigned as an officer and director of Hudson, and Mr. Puro became its president and assumed complete control over its operations." (Emphasis supplied.)

Kerwin and Elliott had begun representing the debtor in 1976 or 1977. Mr. Kerwin testified that sometime after he began that representation, he became aware that Puro was exercising a dominant role in the affairs of the debtor. According to him, Arthur Puro sought to avoid public knowledge of his involvement in Featherworks to the point of being introduced at a dinner meeting in 1979 by a name other than his own.

Mr. Kerwin also testified that Puro had threatened Schachne while the two men were working together. On a single occasion sometime in 1979, after Schachne and Puro were sharing the management of Hudson, Puro, in an expansive mood and in an after-hours conversation following a few drinks, had declared that if Schachne had not permitted him to participate in the management of Hudson, Puro would have had him killed (Tr., 7/27/82, at 84). Although Schachne claimed that he believed that Puro would have done this and felt threatened by the statement, he continued thereafter to work with Puro, and they are now on relatively amiable terms. The

Court, having had occasion to observe Puro over a period of years, finds it difficult to believe that Schachne could have honestly believed that his life was ever in danger.

Mr. Kerwin claimed that Puro misused his power over the debtor. Pressed for the particulars, he referred to the settlement with Guy G. Joseph. Kerwin charged that the settlement was arranged in order to give Windsor a preferred position in relation to Far West.

Mr. Kerwin also claimed that because Featherworks bought the bulk of its raw material from Windsor, it was unable to reduce its debt to that company. Schachne confirmed that the affairs of the three companies—Windsor, Hudson, and Featherworks—had been closely intertwined for some period and that during 1978, 1979, and 1980, Featherworks bought from 70–80 percent of its raw material from Hudson or Windsor. Schachne was unable to recall who sold to whom, saying: "I believe that some of the sales of Windsor went directly to Featherworks in 1978. Although at most times, Windsor sold directly to Hudson, and Hudson sold to Featherworks. But I believe that some of the sales in 1978 were directly to Featherworks." Hearing of July 22, 1982, at 56.

When Schachne was subsequently asked whether the debtor could have bought elsewhere more advantageously, he replied:

"What he asked me was, was whether he felt that Windsor Trading actually charged us more for the feathers then [*sic*] perhaps we could have bought it from other sources. And to the best of my recollection, and I believe the record shows, because I've made this claim before, on the record when I was involved in the Hudson Chapter 11. I did make the claim that I felt that Windsor was over charging at the time. Whether it was over charging Hudson or whether it was over charging Featherworks. I believe that that was my claim at the time, and the record shows that that's what I claimed.

"I certainly don't remember any specific prices any longer, and I certainly don't remember any specific purchases any longer." *Id.* at 61.

Section 510(c) [2] of the Bankruptcy Code codifies the law of equitable subordination as set forth in *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), and *Taylor v. Standard Gas & Electric,* 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1938):

"(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

"(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

"(2) order that any lien securing such a subordinated claim be transferred to the estate."

The theory underlying the doctrine of equitable subordination received its classic exposition in *Pepper v. Litton, supra,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). In that case, the Supreme Court held that the salary claims of the dominant and controlling stockholder of a bankrupt corporation were properly subordinated by the bankruptcy court to those of the corporation's other creditors because of the stockholder's fiduciary position:

"A director if a fiduciary. So is a dominant or controlling stockholder or group of stockholders. Their powers are powers in trust. Their dealings with the corporation are subjected to rigorous scrutiny

2. The legislative intent was explained in Senate Rep. No. 95–985, 95th Cong., 2d Sess. 74 (1978) as follows:

"To date, under existing law, a claim is generally subordinated only if holder of such claim is guilty of inequitable conduct, or the claim itself is of a status susceptible to subordination, such as a penalty, or a claim for damages arising from the purchase or sale of a security of one debtor. The fact that such a claim may be secured is of no consequence to the issue of subordination. However, it is inconceivable that the status of a claim as a secured claim could ever be grounds for justifying equitable subordination."

and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside. While normally that fiduciary obligation is enforceable directly by the corporation, or through a stockholder's derivative action, it is, in the event of bankruptcy of the corporation, enforceable by the trustee." (Citations omitted.) 308 U.S. at 306, 60 S.Ct. at 245.

In reaching this conclusion, the Supreme Court relied on its earlier decision in *Taylor v. Standard Gas & Electric Co.,* 306 U.S. 307, 323, 59 S.Ct. 543, 550, 83 L.Ed. 669 (1939), in which it subordinated the claims of a parent corporation, Standard Gas & Electric Co., "because of the abuses in management due to the paramount interest of interlocking officers and directors in the preservation of Standard's position, as at once proprietor and creditor of Deep Rock."

Following *Taylor v. Standard Gas & Electric Co.* and *Pepper v. Litton,* the transactions of fiduciaries with bankrupt corporations have been subjected to close scrutiny and the claims of such fiduciaries have been subordinated where abuse of the fiduciary relationship to the detriment of other creditors has been found. The doctrine has been applied to stockholders, officers, directors, parent corporations, and *alter egos. Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Sampsell v. Imperial Paper & Color Corp.,* 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1941); *Comstock v. Group of Institutional Investors,* 335 U.S. 211, 68 S.Ct. 1454, 92 L.Ed. 1911 (1948); *In re Mobile Steel Co.,* 563 F.2d 692 (5th Cir. 1977); *In re Multiponics, Inc.,* 622 F.2d 709, 722 (5th Cir.1980); *In re W.T. Grant Co.,* 4 B.R. 53, 74 (Bkrtcy.S.D.N.Y.1980); Herzog & Zweibel, "The Equitable Subordination of Claims in Bankruptcy," 15 *Vanderbilt L.Rev.* 83 (1961).

■ However, equitable considerations can only justify subordination of claims, not their total disallowance. *In re Mobile Steel Co., supra,* at 699. None of the evidence adduced by Kerwin justifies the disallowance of the claims of Windsor.

■ Furthermore, even total control of a debtor's affairs does not necessarily lead to equitable subordination; debts owed stockholders and directors are not automatically denied equality of distribution. *In re Mid-Town Produce Terminal, Inc.,* 599 F.2d 389 (10th Cir.1979); *In re Mobile Steel Co., supra,* at 701. To invoke the doctrine it must be shown that the creditor whose claim is being subordinated engaged in some type of inequitable conduct which resulted in injury to the creditors of the bankrupt or conferred unfair advantage on the claimant. *In re Mobile Steel Co., supra.* In applying the doctrine, several principles must be kept in mind. One is that there should be subordination only to the extent necessary to offset the harm which the bankrupt and his creditors suffered on account of the inequitable conduct. Another is that "an objection resting on equitable grounds cannot be merely formal, but rather must contain some substantial factual basis to support its allegation of impropriety." *Id.,* at 701. The objecting creditor must come forth with enough substantiation to overcome the initial presumption of validity which attaches to a claim established as required by the law.

■ The evidence adduced by Mr. Kerwin, together with the record in *Hudson* of which the Court takes judicial notice, is sufficient to establish the possession by Puro and Windsor of the type of control over the debtor that constitutes one essential condition for the application of the doctrine of equitable subordination. Certainly, such control existed from at least February, 1979, when Puro assumed joint control of Hudson with Schachne. But there is nothing either in the *Hudson* record, or Mr. Kerwin's testimony, to show its existence in August, 1978, when Windsor was given its first lien on the debtor's assets.

Furthermore, while the record establishes control after February, 1979, it falls short of demonstrating the other ingredient necessary for equitable subordination, and that is, the extent to which the claims of Windsor are due to abuse of that control. The facts as to the Joseph settlement are provocative, but that lien is held by Joseph who is not a party to this proceeding.

The only evidence of any abuse by Windsor of its control over Featherworks is Schachne's vague statement that, on occasion, Featherworks paid higher prices for Windsor merchandise than it could have bought elsewhere. That statement lacks the specificity the courts have required for equitable subordination. Equitable subordination is a harsh remedy. Windsor and Arthur Puro, like Far West, were at one time simply creditors of Featherworks' parent. If they are now in a position of ownership, it is because that parent was unable otherwise to satisfy the debts owed them. To subordinate their claims to all other creditors in their entirety requires more than proof of the ability to control Featherworks' purchases and the use of that power to Windsor's advantage.

On this record, the application of Kerwin and Elliott to disallow or subordinate Windsor's claims is denied. If Kerwin and Elliott have any evidence that they were unable to offer because the Court erroneously believed the attorney-client privilege to be a bar, they may move to reopen for consideration of such evidence.

## VII.

### THE MOTION TO INSPECT AND APPRAISE THE DEBTOR'S REAL PROPERTY

Critical to the further development of this proceeding is the value of the debtor's property at 4410 Washington Street, Denver, Colorado. Far West, albeit belatedly, is now seeking leave to have an appraiser enter these premises to appraise their value and thereafter make himself available to the debtor for cross-examination. Far West indicates that it has been informally advised that the building may have a value at the present time as high as $530,000–$550,000. If that were the case, the debtor would have a substantial equity in the property of at least $130,000 which would be available to general creditors on liquidation.

The debtor objects to the requested appraisal on the ground that it is untimely, and that granting it would serve no useful purpose. The debtor observes that the request comes a year and a half after the case was first filed, and after the hearing on confirmation has been concluded. The debtor asserts "that the Court is without discretion to permit the submission of evidence which was clearly available to the party prior to the conclusion of the hearings." Debtor's Affidavit in Opposition, dated October 14, 1982, at 2.

The argument that the hearing on confirmation has been concluded, of course, loses much of its force in view of the fact that the Court is denying confirmation, requiring further proceedings in any event. But even if that were not the case, the Court does not believe that by closing or terminating the hearing with reference to confirmation after all sides have been heard, that it necessarily lost the power to reopen for the purpose of receiving significant and critical evidence. The Court has repeatedly deplored the absence of a current appraisal of the Denver property, and the value of that building is of great importance in this proceeding. That Far West has even belatedly undertaken to supply the gap in the record is a development of value to all the debtor's creditors.

When the Court originally contemplated permitting the requested appraisal, it intended to impose a timetable which would ensure that the appraisal did not further delay proceedings. But it has concluded since then, for the reasons set out in this Opinion, that the debtor's plan cannot be confirmed. Since both sides have indicated that an appeal will be taken whatever the decision on Heller's application to change its vote, it seems likely that the urgency of a speedy appraisal has disappeared. Therefore, the only condition the

Court will impose in granting Far West's motion is that any appraisal made be reduced to writing; that such writing must be made available to the debtor within ten days after it is made; and that the appraiser must make himself available for examination in New York by the debtor at a mutually convenient time no later than forty days after his written report is received by the debtor unless the debtor consents to a later time.