POOLE, Circuit Judge.
 

 First National Finance Corporation (FNF) appeals the judgment of the United States District Court for the Southern District of California granting the motion for summary judgment brought by the trustees in bankruptcy for Westgate-California Corporation. The order disallowed FNF’s claims numbered 73 and 203, and subordinated all of FNF’s related claims against and equity interests in the debtor.
 

 FNF is entirely owned by J. A. Smith. Smith is the brother of C. Arnholt Smith, who formerly controlled Westgate and its numerous subsidiaries, and who was convicted of fraud in connection with his operation of those companies. FNF had many business dealings with Westgate and with C. Arnholt Smith’s now defunct United States National Bank (USNB). Claims 73 and 203 arise out of this close relationship.
 

 I.
 
 CLAIM 73
 

 Claim 73 is based on a note from West-gate to FNF in the amount of $2,550,000. It is undisputed that Westgate never received this money and never made any payments on the note. The district court found that a loan from FNF to Westgate was negotiated but never consummated, and that Westgate never received “valid, legally enforceable consideration for its note, and it is therefore unenforceable.” That judgment would be appropriate in view of the above facts unless FNF could come forward with a specific showing that there remained as a genuine issue for trial whether West-gate received some other form of consideration for its note.
 
 Fed.R.Civ.P.
 
 56(e).
 

 FNF sought to establish that Westgate’s note was made as part of a complicated “accommodation loan” arrangement, and that although Westgate itself received no actual funds in return, the note was supported by other consideration. FNF’s theory is as follows: C. Arnholt Smith approached his brother with the proposition that FNF assist him in improving the financial outlook of USNB by assuming, at least on paper, some of the debts owed to USNB by Westgate’s troubled subsidiary, Yellow Cab Company. When J. A. Smith expressed some doubt as to the wisdom of such an arrangement, his brother represented that FNF would never be called upon to make payments on its notes to USNB because Yellow Cab would repay them. As a guarantee of that promise, C. Arnholt Smith offered to give Westgate’s note for the amount involved. J. A. Smith then acquiesced, and the desired result was achieved through a series of transactions: (1) on October 10, Westgate made its note for $2,550,000 to FNF; (2) that same day, FNF made two notes to USNB for $1,400,-000 and $1,150,000, in return for cash from USNB; (3) somehow, that cash found its way into the USNB account of United Oil Well Supply Company (UOWSC), a subsidiary of FNF; (4) on October, 16, UOWSC wrote three checks to Yellow Cab in amounts totalling $1,400,000; (5) on October 24, UOWSC wrote four checks to Yellow Cab in amounts totalling $1,150,000; (6) Yellow Cab thereafter used the money to repay outstanding indebtedness to USNB. Yellow Cab never paid USNB or FNF any money on account of the cash transfer; rather, it went into bankruptcy. When USNB went into receivership, the FDIG sued and collected on FNF’s two notes.
 

 FNF argues that these specific facts, set forth in J. A. Smith’s affidavit, raise a genuine issue whether Westgate’s note was given as a guarantee that Yellow Cab would repay FNF’s notes to USNB. FNF urges that resolution of this issue is necessary to determine whether Westgate received consideration for its note, pointing to California authority for the proposition that consideration may be constituted by bargained-for benefits accruing to a third
 
 *1042
 
 party. The trustees deny that the West-gate note was given as security for FNF’s loan to Yellow Cab, and in fact argue that the two were parts of separate and unconnected transactions, one consummated and the other not. Of course, absent any other considerations, this dispute would mean only that summary judgment is inappropriate.
 

 The trustees argue, however, that there is undisputed evidence in the record that would, as a matter of law, preclude a trier of fact from determining that the Westgate note was given in return for FNF’s loan to Yellow Cab. This evidence is FNF’s verified complaint against British Columbia Investment Company (BCIC), in which FNF alleged that sometime after Yellow Cab received $2,550,000 from FNF, the president of BCIC represented to FNF that BCIC would assume Yellow Cab’s debt. FNF alleged that BCIC requested that the debt be carried on FNF’s books as the debt of BCIC, that FNF complied with this request, and that BCIC made payments on the debt.
 

 While these facts undeniably constitute strong evidence for the trustees’ position, we cannot conclude that they legally preclude a finding that Westgate stood as guarantor on the debt. If, as alleged in J. A. Smith’s affidavit, the Westgate note was given as security for the debt, the fact that another party later assumed primary responsibility for the debt would not by itself relieve Westgate of its surety position. FNF could continue to look to Westgate as guarantor even though BCIC had assumed the debt.
 

 Thus, FNF has raised a genuine issue of material fact as to whether Westgate received consideration for its note and the trustees have presented nothing that conclusively lays that issue to rest. In this situation, summary judgment was inappropriate. We therefore reverse the summary denial of FNF’s claim
 
 73,
 
 and remand for further proceedings.
 

 II.
 
 CLAIM 208
 

 Claim 203 arises out of a real estate transaction. The following facts are undisputed: in 1969, while J. A. Smith was serving as a director of the Westgate subsidiary Westgate Realty (Realty), Realty suggested that various properties in Kern County be accumulated for sale to a non-Westgate company, Swesga Land Corporation (Swes-ga). One parcel in the proposed accumulation belonged to FNF. FNF found the plan agreeable, and transferred its parcel to Realty, without consideration, for purposes of sale to Swesga. Realty sold the accumulation to Swesga, taking in return a series of notes secured by deeds of trust on the individual parcels in the accumulation. Realty recorded its deed of trust on the FNF parcel and then, in accordance with its agreement with FNF, assigned the deed of trust to FNF. Shortly before this assignment was accomplished, Don Heffner, an employee of Realty, wrote to J. A. Smith as follows:
 

 Assignment of beneficial interest in the Deeds of Trust securing said notes and original Deeds of Trust will be forwarded to you when returned to us by the Recorder’s Office.
 

 J. A. Smith claims the inference from this statement was that Realty was taking responsibility not only for recordation of its own interest in the deed of trust, but also for recordation of FNF’s subsequent interest in that deed. Neither FNF nor Realty recorded FNF’s interest in the deed.
 

 FNF had borrowed money from USNB in order to clear preexisting deeds of trust given by it when it originally purchased the property. When Realty transferred the new deed of trust to FNF therefore, FNF assigned it and the note it secured to USNB as collateral for USNB’s loan. As FNF received payments from Swesga, it transferred them to USNB to be applied against the loan.
 

 After some time, however, Swesga sold the property to a third party and ceased making payments on the loan. The sale was arranged by C. Arnholt Smith and Don Heffner, who by this time had left Realty to enter private law practice. Heffner made representations to Title Insurance
 
 *1043
 
 and Trust Company that a “Request for Reconveyance” of FNF’s deed of trust would be forthcoming. Without waiting for this document, and with knowledge of the existence of FNF’s deed of trust, the insurance company issued a policy of title insurance showing the property to be free and clear of FNF’s interest. This made possible a sale of the property unencumbered by FNF’s unrecorded interest to a third party without notice of that interest. FNF claims that it learned of these transactions only after Swesga ceased payment on the note.
 

 FNF seeks to recover from West-gate the amount outstanding on Swesga’s note, founding liability on either of two theories: (1) FNF reasonably relied on a representation from Realty that Realty would record FNF’s deed of trust, and had Realty performed this promise, the sale of the property could not have been accomplished; or (2) C. Arnholdt Smith and Heffner were acting on behalf of Realty when they arranged, by misrepresentations, to have the insurance policy issued on the property. Westgate’s trustees deny that Realty made any representation on which FNF could reasonably have relied concerning recordation of the deed of trust and assert that, in any case, FNF did not rely on any representations from Realty when it failed to record. In addition, they deny that C. Arnholt Smith and Heffner were acting in any capacity connected with West-gate when they made the representations.
 

 Despite these fairly significant issues of fact, the district court entered summary judgment denying claim 203. It did so without discussing FNF’s second theory. As to the first theory, the court held that it was not necessary to determine responsibility for the failure to record because, in any case
 

 the consequences of the non-recording, enabling Calafia (successor to Swesga) to resell the land free of any interest or lien of First National Finance, are more equitably borne by J. A. Smith, First National Finance, and Title Insurance and Trust Co. than by the debtors.
 

 The district court offered no explanation for this determination, and we find none. If the evidence and all the inferences that may reasonably be drawn from it are viewed in the light most favorable to FNF, as they must be on a motion for summary judgment, it is difficult to identify the equitable principle entitling the debtor to judgment at this stage. FNF has raised a genuine issue as to whether persons acting on behalf of a Westgate subsidiary perpetrated a fraud on FNF. In these circumstances, summary judgment was inappropriate. We therefore remand for further proceedings relative to claim 203.
 

 III.
 
 SUBORDINATION OF ALL FURTHER CLAIMS AND EQUITY INTERESTS.
 

 In addition to its rulings on claims 73 and 203, the district court exercised its equitable power to subordinate all remaining claims and interests of FNF and J. A. Smith, relegating them to a class established for those “insiders and other parties who participated in the Westgate fraud.” Smith is not a party to this appeal, and we consider only the subordination of FNF’s claims and interests.
 

 A bankruptcy court may subordinate a claim when it determines that the claimant has acted inequitably in the course of his relationship with the debtor and that those actions have harmed the debtor or its other creditors in some way.
 
 Pepper v. Litton,
 
 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed.2d 281 (1939);
 
 In re Westgate-California Corp., Trone v. Smith,
 
 642 F.2d 1174, 1177-78 (9th Cir. 1981). A study of the district court’s memorandum decision indicates that it looked entirely to the actions of Smith to justify its subordination order:
 

 J. A. Smith’s conduct with regard to the transactions underlying [claims 73 and 203] evidences a pattern of irregularities, mismanagement and negligence. The affidavits, statements, and correspondence of J. A. Smith support a finding of gross improprieties and self-dealing in breach of his fiduciary duties as an officer of Westgate-California Realty. ... J. A.
 
 *1044
 
 Smith was an integral part of the fraud involving Westgate-California Corp. and United States National Bank, caused in part by the transfer of properties and assets in self-dealing, fraudulent transactions through private or family-owned and controlled companies, such as First National Finance and United Oil Well Supply Company. . . . From 1965 until April 4, 1972, J. A. Smith was the Vice President of Westgate-California Realty, supervising its land and real estate activities in the San Joaquin Valley. Concurrently with his relationship to Westgate, J. A. Smith placed himself in a direct conflict of interest by real estate acquisitions and speculation in his own name for his personal companies. Title records indicate that the same parcel of land was traded between J. A. Smith companies and Westgate or its subsidiaries at ever increasing prices.
 

 However, the court made no finding that would justify holding FNF, a separate legal entity, responsible for the misconduct of its owner: it did not find that Smith acted as FNF’s agent when he committed his inequitable acts, and it did not find that FNF was Smith’s alter ego so as to justify this disregard'of FNF’s separateness as a corporate entity. Although one or both of these findings may ultimately be warranted in this case, we cannot make that determination on the record presented to us. In the absence of any other findings that would tend to indicate that FNF has committed the requisite inequitable, harmful acts, summary subordination of FNF’s claims and interests is premature and we therefore must remand for further proceedings.
 
 [1]
 

 In sum, we reverse the district court’s summary judgment denying FNF’s claims 73 and 203, and subordinating all FNF’s remaining claims and interests. We remand all three matters for further proceedings consistent with this opinion.
 

 [1]
 

 . We are constrained to note that the record as presented to us is inadequate to support a determination that J. A. Smith behaved inequitably. Where it is sought to invoke the court’s equitable subordination power, the record must objectively disclose a threshold demonstration that the claimant has behaved inequitably, to the detriment of the debtor or its other creditors. Once this has been shown by specific facts, the burden then falls upon a fiduciary claimant to persuade the court of his good faith in dealing with the debtor.
 
 See Bankers Life and Casualty Co. v. Kirtley,
 
 338 F.2d 1006, 1011 (8th Cir. 1964). A record of particular acts of misconduct will be especially important in view of the fact that the district court on remand may wish to require Smith to
 

 come forward, with reasonable dispatch and certainty, with evidence indicating that the harm caused by the challenged conduct was discrete in nature and did not result in general prejudice to the bankruptcy proceedings, and that the court can without undue complication determine the amount and depth of harm done.
 

 Troné
 
 v.
 
 Smith, supra,
 
 at 1178.