In re MISSIONARY BAPTIST FOUN-
DATION OF AMERICA, INC.,
et al., Debtors.

Robert B. WILSON, Trustee, Plaintiff,

v.

Robert G. HUFFMAN, Defendant.

Bankruptcy No. 580–00084.

United States Bankruptcy Court,
N.D. Texas,
Lubbock Division.

Feb. 25, 1985.

Robert B. Wilson, Lubbock, Tex., for debtors.

James V. Hoeffner, Lubbock, Tex., for defendant.

## MEMORANDUM AND ORDER

BILL H. BRISTER, Bankruptcy Judge.

This memorandum treats the subject of equitable subordination under § 510(c)(1) of the Code of an unsecured claim of a fiduciary. This Court had entered an earlier order on the scheduled claim [1] of Robert G. Huffman ("Huffman") on July 12, 1982, allowing Huffman's claim as an unsecured claim in the sum of $119,005.00, but subordinating the claim to the allowed claims of the general unsecured creditors in this bankruptcy case. The United States District Judge for the Northern District of Texas entered memorandum opinion on December 15, 1982, affirming the order of the

Bankruptcy Judge. The United States Court of Appeals for the Fifth Circuit affirmed the District Judge and the Bankruptcy Judge on the "insider" conclusions, but remanded the case to the Bankruptcy Court for further findings and conclusions on the subordination issue. *Matter of Missionary Baptist Foundation of America, Inc.*, 712 F.2d 206 (5th Cir.1983).

The opinion of the Bankruptcy Judge, the opinion of the District Judge, and the appellate opinion of the Fifth Circuit each contained an accurate recitation of the general facts which resulted in this litigation. All of those facts will not again be repeated in this memorandum. It is sufficient to note that Huffman and Land Wall, the principal officer and controller of the nonprofit corporation, Missionary Baptist Foundation of America, Inc. ("MBFA") and its subsidiaries, as co-partners, purchased Dumas Convalescent Center in Dumas, Texas, in May, 1975. Further in May 1975, they organized a corporation under the name of "West Texas Home Health Care, Inc.", a business corporation with all of the capital stock being issued to Wall and to Huffman. West Texas Home Health Care entered into a "management contract" with the partnership, Wall and Huffman, to manage and operate the newly acquired Dumas Convalescent Center. In early 1977 Wall, individually, purchased Crestview home in Throckmorton, Texas. Huffman had no apparent ownership interest in Crestview. On February 1, 1977, soon after its acquisition by him, Wall transferred his interest in Crestview to Pampas Enterprises, a partnership composed of Wall and three family members. On that same day Pampas entered into a management contract with West Texas Home Health Care, Inc., the corporation whose capital stock was owned entirely by Huffman and Wall. Crestview and Dumas were sold to MBFA in April 1977, two years after the Dumas Convalescent Center acquisition by the partnership of Wall and Huffman and two

---

**1.** Huffman did not file a proof of claim in this bankruptcy case and is relying on the provisions of § 1111(a) of the Code which provides that a proof of claim or interest is deemed filed under § 501 for any claim or interest that appears in the schedules filed by the debtor, excepting only claims that are scheduled as disputed, contingent or unliquidated.

months after the Crestview home acquisition by Wall. Under the terms of the packaged sale MBFA assumed all indebtedness encumbering the properties and agreed to pay $148,014.00 to Wall and Huffman for the composite equity. Huffman and Wall, individually, each received a promissory note for $74,007.00, executed by MBFA and secured by a second lien on the Dumas property. Contemporaneously with the sale of the homes, West Texas Home Health Care, Inc. assigned its contractual rights in both homes to MBFA, receiving therefor two unsecured promissory notes, each in the amount of $88,860.00. Wall, purportedly acting to dissolve West Texas Home Health Care, Inc., "transferred" one of those $88,860.00 corporate notes to Huffman and "transferred" the other such note to himself. No formal dissolution proceedings for West Texas Home Health Care, Inc. were filed with the Secretary of State of Texas.[2]

The payments provided by the $74,007.00 note were made by MBFA to Huffman through August 1980. After the August 1980 payment the records of MBFA reflected a balance owing to Huffman on the $74,007.00 note of $37,170.96. No prepetition payments had been made to Huffman on the $88,860.00 note. The books and business records of the debtor reflected that those monies were owed to West Texas Home Health Care, Inc. The schedules filed by the debtor, however, did indicate total indebtedness to Huffman on two notes in the total sum of $119,007.00.

Debtor filed petition for order for relief under Chapter 11 of Title 11, United States Code on October 15, 1980. Two weeks later Robert B. Wilson was appointed trustee. The trustee timely challenged Huffman's scheduled claim, contending that it was based on insider transactions and should be subordinated under § 510(c)(1).

This Court's order of July 12, 1982, contained findings which supported the conclusion that the sale of the Dumas and Crestview homes to MBFA, and the assignment of the management contracts owned by West Texas Home Management, Inc. to MBFA, were "insider" transactions. The Fifth Circuit affirmed the findings of this Court that Huffman was an insider[3] as far as the transactions involving both the $74,007.00 notes and the $88,860.00 notes were concerned. However, notwithstanding the fact that the "insider" transactions had the effect of making Huffman a "fiduciary", the appellate court concluded that there were not adequate findings contained in the Memorandum and Order which met the triad test for equitable subordination of claims provided by *Matter of Mobile Steel Company*, 563 F.2d 692 (5th Cir.1977). The case was remanded to the bankruptcy court for additional findings.

Under *Mobile Steel* the prerequisites to equitable subordination are findings that (1) the claimant engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors of the debtor or conferred unfair advantage on the claimant, and (3) equitable subordination of the claim is not inconsistent with the provisions of the Bankruptcy Code. 563 F.2d at 699, 700. The thrust of the opinion by the Fifth Circuit on the earlier appeal was that mere proof of a fiduciary relationship is insufficient to support equitable subordination. While a claim arising out of dealings between a debtor and its fiduciary must be rigorously scrutinized by the courts, the claim still enjoys *prima facie* validity. *See* Rule 3001(f), Rules of Bankruptcy Procedure. A claim is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a). The trustee, by objecting to the scheduled claim, has the burden of going

---

**2.** No challenge to Huffman's "ownership" of the $88,860.00 note has been advanced by the trustee, notwithstanding the fact that proper corporate procedures do not appear to have been followed in "transferring" the note to him. Therefore, for the purposes of this memorandum I will assume that Huffman properly owns that note.

**3.** As the Fifth Circuit noted in its opinion of the earlier appeal, an insider of an affiliate is, by definition, an insider of the debtor. 712 F.2d at 211.

forward with evidence of facts which overcomes the presumption of validity which attaches to all properly filed claims. The trustee can meet that burden by establishing the elements of the triad test set out by *Mobile Steel.* If the trustee meets that burden and thus overcomes the *prima facie* showing the burden of going forward shifts to Huffman, the claimant, who has the ultimate burden of persuasion. *See* 712 F.2d at 212. There the Fifth Circuit, quoting from its opinion in *Matter of Multiponics,* 622 F.2d 709, 714 (5th Cir.1980), noted:

> "This proof allocation provides a proper balance of burdens, assuring that the trustee does not underprove his objections while, at the same time, assuring that the fiduciary need not overprove his good faith and fairness at the mere cry of inequity by the trustee."

The initial inquiry under *Mobile Steel* is whether Huffman has engaged in some type of inequitable conduct. That term has not been defined with precision in the cases. There are indications from some cases that it can be conduct that is less than fraudulent. *See* e.g. *In re Mercer Trucking Company,* 16 B.R. 176, 189 (Bkrtcy.N.D.Tex.1981). The Fifth Circuit, in its earlier opinion in this case, noted that the Courts have recognized three general categories of conduct considered sufficient to warrant equitable subordination: (1) under capitalization; (2) fraud, illegality, or breach of fiduciary duties; and (3) the claimant's use of the debtor as a mere instrumentality or *alter ego.* 712 F.2d at 212.

The debtor was a nonprofit corporation and, at least in theory, its costs of operation were supposed to have been fully reimbursed by divers governmental programs with a nominal amount of income being received from private patients. The issue of undercapitalization has no relevance to this case. Further, Huffman was not a director of the corporate debtor, he was not an officer of the corporate debtor, and, at least as far as any period of time relevant to this memorandum is concerned, he was not an employee of the corporate debtor. Huffman, by virtue of his insider status is, by definition, an insider of the debtor. However, that statutory relationship represents his sole contacts with MBFA during relevant times. Therefore, Huffman, himself, has not used the debtor as a mere instrumentality or *alter ego.* That leaves for analysis the second category of conduct ... fraud, illegality, or breach of fiduciary duty.

The trustee has been unable to point to any fraudulent activity or other overt act of misconduct on the part of Huffman, except for his argument that Huffman had no financial exposure in the two transactions, that he paid no monies whatsoever for an interest in the Dumas home, that he was the beneficiary of Wall's munificence in acquisition of an equal share of the proceeds of sale of the Crestview home, and that Huffman has been enriched by those transactions. Those arguments advanced by the trustee factually appear to be true. As far as the record is concerned Wall was the "money man" in all of the transactions and Huffman neither invested any monies in either of the homes nor was he exposed financially in either of the transactions. Huffman did sign conveyancing documents required to effect sale of the Dumas home and the Crestview home to MBFA. However, I can find no *overt* acts of misconduct by Huffman. Something more than those transactions alleged by the trustee is required before Huffman's debts properly can be subordinated. Those factual findings argued by the trustee substantially were contained in the "order on claim of Robert Huffman" which I entered on July 12, 1982, and which was appealed to the Fifth Circuit. It is apparent that the appellate court opined that something more was required to permit subordination under § 510(c)(1). In its opinion the Fifth Circuit stated:

> "Whether or not Huffman's insider status, coupled with his receipt of the fruits of Wall's manipulations, is tantamount to the unfairness, bad faith or unconscionable wielding of control for personal gain envisioned by *Mobile* and *Multiponics* is

problematical, in light of our holding that an objection on equitable grounds cannot be merely formal, but rather must contain some substantial factual basis to support its allegations of impropriety. 712 F.2d 212, 213.

The trustee has failed to adduce evidence of overt acts of misconduct on the part of Huffman. The next inquiry is whether Wall engaged in inequitable conduct which meets the *Mobile Steel* test and, if he has so engaged, whether that inequitable conduct can be imputed to Huffman.

The Fifth Circuit, in its earlier opinion in this case, cautiously recognized the right of the bankruptcy judge to take notice of his own files and records, to take judicial notice of the record in prior related proceedings, and to draw reasonable inferences therefrom. 712 F.2d at 211. Throughout the proceedings in this case it is clear that Wall dealt with MBFA as his mere instrumentality or *alter ego*. As an officer, director, and controller he breached the fiduciary relationship imposed by those offices in his self dealing with the debtor and its affiliates. He transferred monies and assets between the subordinate entities and the parent entity with impunity. Although the nonprofit debtor corporation had no voting securities Wall controlled the corporate activities with an "iron hand." In fact, at the time Wall caused the Chapter 11 petition to be filed he effectively acknowledged that no separate identity had been retained by the several corporations and that they always had been treated as one entity. He caused the Chapter 11 case to be filed, naming all of those "entities" in one bankruptcy case. If this memorandum

was addressing the issue of subordination of any claim by Wall I would consider *all*[4] of those transactions and quickly find that the elements of *Mobile Steel* were apparent and that any allowed claim should be subordinated under § 510(c)(1).

However, while the full scope of Wall's dealings could be considered in making the subordination determination those dealings by Wall cannot be imputed to Huffman. Notwithstanding the fact that Huffman by definition is an insider of the debtor he was an "insider" only in connection with the Dumas home transaction and the Crestview home transaction. As insider with Wall any inequitable conduct on the part of Wall in connection with the transactions involving those two homes only should be imputed to Huffman.

Wall's conduct in those two transactions was inequitable. First, there were at least two different fiduciary relationships existing between Wall and MBFA. One is the fiduciary relationship imposed by § 101(25) of the Code which places an "insider" in that relationship. However, there was an actual fiduciary relationship[5] existing between Wall and the debtor corporation by virtue of his status as officer, director, and controller. Wall engaged in self-dealing with the corporation in those two transactions. He caused the Dumas home and the Crestview home to be sold to MBFA for considerably more consideration than that received by MBFA when it subsequently sold them. The price received by Wall and Huffman in the package exceeded the fair value of the property interests conveyed by them to MBFA. It was wrong for Wall to deal with the debtor corporation

---

4. As far as any claim by Wall might have been concerned it would not be necessary to limit the determination of inequitable conduct to the particular transactions involving the Crestview home and the Dumas home and the full scope of his dealings with the debtor corporation could be considered. In *Mobile Steel* the Fifth Circuit had noted that inequitable conduct directed against the debtor or its creditors may be sufficient to warrant subordination of a claim *regardless of whether it was related to the acquisition or assertion of that claim.* (emphasis added) 563 F.2d at 700.

5. Corporate officers and directors owe a fiduciary duty to the shareholders. Because they have the benefit of superior knowledge regarding the affairs of the corporation they are obliged by law to disclose facts within their knowledge to shareholders and to deal with them in an atmosphere of trust. While the debtor corporation in this case was a not-for-profit corporation, the same rationale of fiduciary obligations should apply. Particularly should that be true where, as here, the officer and director Wall controlled the corporation.

at all, regardless whether the corporation profited. A trustee, an executor of an estate, a corporate officer or director, or any similar fiduciary is prohibited by common sense and by law from dealing with his trust. Here, however, the price received by MBFA when it sold the two homes was substantially less than that price at which Wall and Huffman sold those two homes to MBFA. Huffman argues that the sale to MBFA was a fully leveraged transaction and that normally one can receive a higher price for property when it is fully leveraged than when he is seeking some cash consideration. I cannot quarrel with that argument. However, MBFA was a nonprofit corporation through which a considerable amount of money passed each year. Those monies could not be diverted to the control group except for salaries and nominal expenses. Whether Wall intended from the beginning that those notes would be paid from the assets of the nonprofit corporation is not reflected in the record. However, that precisely was what happened. Huffman's notes and Wall's notes were regularly paid each month from corporate assets, even where creditors who had actually furnished services and goods were not being paid. For that reason I am not persuaded by Huffman's argument that he showed good faith when he released his lien to permit sale by MBFA of those homes. He was continuing to receive those payments from MBFA assets, regardless whether the notes were secured or unsecured. Fair inference from the evidence adduced at trial permits the conclusion that Wall intended [6] that his notes and Huffman's notes would be paid by MBFA when no other obligations were being paid.

The second step of the *Mobile Steel* test is whether the misconduct which has been imputed to Huffman conferred an unfair advantage on him or resulted in injury to the creditors of the debtor. The answer to that inquiry is apparent. Huffman received the scheduled payments on the $74,007.00 note through the August 1980 payment, only two months prior to the filing of the bankruptcy petition. During the first eight months of 1980 the debtor's payments to other creditors ranged from four months to six months in arrears. Those payments were made to Huffman without fail while utilities, withholding taxes on employee's wages, social security on employees, suppliers of food and other creditors who furnished services or goods were being paid nothing. Clearly those payments conferred an unfair advantage on Huffman and, to the extent that monies were being paid to him which otherwise would have been available to payment to creditors, it resulted in injury to those creditors. While no payments were being made on the $88,860.00 note that note was so intertwined with the $74,007.00 note that they cannot meaningfully be separated.

Finally, one of the primary concepts of bankruptcy statutes is to insure fair and equitable distribution of assets to the creditors. Huffman was receiving payment when other creditors were not receiving payment and thus that concept of fair and equitable distribution was violated. Thus equitable subordination of the claim is not inconsistent with the provisions of the Bankruptcy Code and the third step of the triad *Mobile Steel* test is answered.

In summary, I have found no *overt* acts of inequitable conduct on the part of Huffman but I have concluded that the inequitable conduct on the part of Wall, involving the Dumas home transaction and the Crestview home transaction, should be imputed to Huffman. Thus the trustee has overcome the presumption of validity which attaches to Huffman's claim. Huffman's evidence and argument attempting to prove his good faith and fairness in the dealings are not persuasive. I conclude that Huffman's claim should be allowed as an unsecured claim but that it should be subordinated under § 510(c)(1).

6. To his credit Wall did not schedule his notes in the bankruptcy schedules and waived any right to payment of the unpaid balances.

It is, therefore, ORDERED by the Court that the claim by Robert Huffman in the sum of $119,005.00 be, and it is hereby, allowed, but it is further ORDERED that its payment be subordinated under § 510(c)(1) to the allowed claims of the general unsecured creditors in this bankruptcy case.

All relief not herein granted is denied.

The Clerk is directed to file this Memorandum and Order and to furnish a copy to the attorneys of record.