**In re Philander P. CLAXTON, III, Bankrupt.**

**Richard A. BARTL, Trustee in Bankruptcy, Plaintiff,**

**v.**

**Ned WALSH, Susan P. Williams, Allen & Company, Inc., Nella Company, Thomas R. Debenedetto, J. Gerald Combs, George W. Siguler, Bandierante Corporation, Ballantrae Manor, Inc. and County of Fairfax, Virginia, Defendants.**

**Bankruptcy No. 79–684.
Complaint No. 13.**

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Aug. 4, 1987.

Robert O. Tyler, Tyler, Bartl, Burke & Albert, Alexandria, Va., for trustee in Bankruptcy.

Richard Stahl, Stahl & Buck, Annandale, Va., for debtor, Bandierante Corp., Ballantrae Manor, and Susan P. Williams.

Richard G. Wise, Pohoryles & Greenstein, P.C., Washington, D.C., for Ned Walsh.

Carl F. Bowmer, Christian, Barton & Epps, Richmond, Va., for Allen & Co., Inc., Nella Co., Thomas R. DeBenedetto, J. Gerald Combs and George W. Siguler.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr., Chief Judge.

■ This matter arises on the filing herein by the Trustee in Bankruptcy of a "Complaint to Determine Interest in Property, Sell Property Free and Clear of Encumbrances, and for Equitable Subordination."[1] The property at issue is an improved 7.3–acre lot located in McLean, Virginia, formerly owned by the debtor, Philander P. Claxton, III ("Claxton, III") and constitutes the sole asset of the estate.

Following a hearing on April 22, 1985, the Court granted the Trustee in Bankruptcy ("trustee") partial summary judgment on Counts I and II of his complaint. An order was entered determining that defendants Bandierante Corporation ("Bandierante") and Ballantrae Manor had no interest in the property. The order also allowed the property to be sold free and clear of liens and encumbrances, with the liens and encumbrances to attach to the proceeds of sale.[2] Remaining for trial was Count III, which asserted that the liens of the first, second, and third deeds of trust on the property should be equitably subordinated to the interests of all other creditors. The Court may order equitable subordination,

---

1. The involuntary bankruptcy petition against Philander P. Claxton, III was filed on June 26, 1979, prior to the October 1, 1979 effective date of the Bankruptcy Reform Act of 1978, 11 U.S.C. §§ 101–151326. Accordingly, this case continues to be governed by former Title 11, the Bankruptcy Act of 1898. 11 U.S.C. § 101 (1978).

2. Subsequent to trial, the McLean property was in fact sold free and clear of liens pursuant to a consent order approved by the Court on December 20, 1985. The sale rendered moot the action for relief from the stay to foreclose on the property, filed by defendant Ned Walsh, which was still pending at the time of trial. *See* Complaint No. 12.

argue the plaintiffs, because the holders of the three trusts acted at the direction of Claxton, III "in furtherance of his continuing effort to keep the property out of the bankruptcy estate, unavailable to Claxton, III's creditors, and retain it for the benefit of Claxton, III, those occupying the position of insider to him, and those creditors which he may desire to prefer." [3]

As a preliminary matter at trial on November 13, 1985, counsel for the trustee and for defendants Bandierante and Susan P. Williams advised the Court that the trustee had agreed to dismiss Count III as to the second and third trusts and to pay the second and third trust notes from the proceeds of the sale of the property.[4] Consequently, the only issue litigated at trial was whether the lien of the first trust note held by defendant Ned Walsh ("Walsh") should be equitably subordinated to the claims of administrative and unsecured creditors.

The evidence presented by the trustee in support of his request for equitable subordination concerned the circumstances surrounding Walsh's acquisition of his interest in the first trust note, Bandierante's acquisition of an interest in the same note, and Walsh's issuance at the direction of Claxton, III, of Certificates of Participation in Bandierante's interest in the note.

Providence Savings & Loan, the original holder of the first trust note, conveyed the note to D. Gay Walde. Walde, in turn conveyed the note to Mrs. Mildred A. Loveridge, who in July of 1984 resold the note to Ned Walsh, the defendant herein. Before her conveyance to Walsh, Loveridge transferred the note to an entity named Court of Flags, which in turn transferred the note back to Loveridge.

During his tenure as holder of the first trust note, Walsh has, at the direction of the Bandierante Corporation, issued Certificates of Participation in Bandierante's share of the note. The debtor, Philander P. Claxton, III, held the office of president of Bandierante, and Walsh acknowledged that the instructions regarding the certificates came from Claxton, III. The origin of Bandierante's alleged share of the note is uncertain; although Philander P. Claxton, Jr., secretary of Bandierante, testified that Bandierante purchased its interest in the note from D. Gay Walde for the sum of $250,000.00, Claxton, Jr.'s testimony was based solely on his conversations with his son, Claxton, III. Claxton, Jr. testified that Bandierante and Loveridge together purchased the note from Walde; the note was transferred from Walde to Loveridge, who paid $150,000.00, "as holder". Walsh testified that, at the time of his purchase from Loveridge, he understood that he would own only a portion of the note. Walsh, however, could point to no document evidencing Bandierante's interest in the note; in succession, the endorsements on the note read: Providence Savings and Loan by Vivien M. Harn, D. Gay Walde, Mildred L. Loveridge, I. Vance Henderson, President, Court of Flags Associates, Inc., Mildred L. Loveridge.

In an affidavit dated April 17, 1985, Claxton, III described the transaction by which Bandierante acquired its interest:

Bandierante purchased the [Providence] note from D. Gay Walde in 1981 for approximately $250,000 and subsequently sold portions of the note.... Mildred Loveridge purchased a $150,000 portion of the Providence note from Bandierante in May 1981 and then sold back Bandierante $75,000 of it in a series of transactions between September 1981 and May 1982.

Yet another characterization of Bandierante's participation in the Note is contained in a Trust Agreement between Bandier-

---

3. See, e.g., Matter of Claxton, 30 B.R. 199 (Bankr.E.D.Va.1983) (Claxton, III found to have acted with actual intent to hinder, delay, and defraud creditors by organizing his relatives and friends into a network of agents whose activities he orchestrated in an attempt to keep the McLean property out of the bankruptcy estate).

4. Due to a disagreement between counsel concerning the exact terms of their understanding, a consent order embodying the partial dismissal was not presented to the Court for entry until March 26, 1986.

ante, Ned Walsh, Emerald Electronics, Inc., and H. Gilman Williams, dated July 16, 1984, under authority of which Walsh issued Certificates of Participation.

As of July 15, 1984, the portions of the Note owned by each of the Owners in the Order they are to be paid is as follows:

| | |
|---|---|
| Ned Walsh | $115,000.00 |
| H. Gilman Williams | 50,000.00 |
| Emerald Electronics | 75,000.00 |
| Bandierante Corp. | 125,000.00 (the balance) [5] |

... The Owners want the Note to be held in trust for them by the Holder [Ned Walsh], and he agrees to do so under the following terms and conditions:

... 4. The Owners may sell, assign, or transfer their portions of the note by notifying the Holder in writing of their intentions. The Holder will then issue a new Certificate of Participation in favor of the new Owner.

Despite the apparent lack of documentation of the transaction by which Bandierante acquired its interest in the note, Walsh issued, at Claxton, III's direction, documents entitled Certificate of Participation which parceled out to others Bandierante's supposed share of the note. The recipients of Certificates were, without exception, claimants against the bankruptcy estate of Claxton, III. The Certificates make no mention that the recipient was to receive a portion of a share *held by Bandierante.* Instead the pertinent portion of these documents recited:

I [as "holder of a promissory note made by Philander P. Claxton, III on August 21, 1978"] certify that as of this date, name is the owner of a amount portion of the Note without the accrual of interest thereon. Said portion shall have preference and priority to other portions of the note except for amount, with respect to the proceeds of sale, retirement or hypothecation of the Note.
September 4, 1984
    /s/ Ned Walsh, Holder

From these facts the Trustee requests that the court find good cause for equitable subordination of the first deed of trust.

The leading case on this issue was enunciated by the Fifth Circuit in *Matter of Mobile Steel Co.,* 563 F.2d 692 (5th Cir. 1977). *See* 3 *Collier on Bankruptcy* ¶ 510.05[02], at 510–9 through 510–19 (15th ed. 1986). The *Mobile Steel* court stated that three conditions must be met before the doctrine of equitable subordination may be employed to adjust the usual order of priority among creditors:

1. The claimant whose interest is sought to be subordinated "must have engaged in some type of inequitable conduct."

2. This inequitable conduct "must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant."

3. Subordinating the creditor's claim "must not be inconsistent with the provisions of the Bankruptcy Act."

*Mobile Steel, supra,* 563 F.2d at 700. The *Mobile Steel* court also set forth three principles to be consulted in determining whether the above three conditions have been satisfied. *Id.* First, the inequitable conduct need not be "related to the acquisition or assertion of that claim" so long as it unfairly affects the bankruptcy distribution to other creditors. *Id.* Second, the creditor's claim "should be subordinated only to the extent necessary to offset the harm" caused by the inequitable conduct. *Id.* at 701. Finally, the holder of a verified proof of claim (or, in this case, the holder of a perfected secured claim) need not prove the validity and honesty of his claim until after the objecting trustee " 'come[s] forward with enough substantiations to overcome the claimant's *prima facie* case.' " *Id.* (quoting 3A *Collier on Bankruptcy* ¶ 63.-06, at 1785 (14th ed. 1976)). In other words, an objection based on equitable considerations "cannot be merely formal, but rather must contain some substantial factu-

---

**5.** H. Gilman Williams is the debtor's father-in-law. Emerald Electronics is a wholly-owned subsidiary of Bandierante Corporation.

al basis to support its allegation of impropriety" before the burden of proof shifts to the claimant to defend his claim. *Id.*

The trustee has conceded that Walsh himself is without fault, premising his complaint for equitable subordination entirely on the argument that Walsh's interest in the first trust is tainted by Claxton, III's improprieties. According to the trustee, the transactions by which Walsh became holder of the first trust were orchestrated by Claxton, III as a part of a continuing scheme to pay preferred creditors outside the bankruptcy distribution process and keep the Ballantrae Lane property outside the jurisdiction of the bankruptcy court.

█ Whether a creditor can be penalized for the inequitable conduct of another person—in this case, the debtor himself—is the threshold issue for decision.[6] The court in *In re Missionary Baptist Foundation of America, Inc.*, 48 B.R. 885 (N.D. Texas 1985) held that although the defendant creditor committed "no *overt* acts of inequitable conduct," inequitable conduct on the part of another person could be imputed to the defendant and the defendant's claim could be subordinated to the allowed claims of general unsecured creditors under 11 U.S.C. § 510(c)(1). 48 B.R. at 889–90.

In *Missionary Baptist,* the principal officer, director, and controller of the debtor corporation was Land Wall ("Wall"). *Id.* at 886. The court found that Wall committed numerous improprieties in his dealings with the debtor. *Id.* He treated the debtor as "his mere instrumentality or *alter ego*"; he breached various fiduciary duties owed to the debtor and its affiliates; he "transferred monies and assets between the subordinate entities and the parent entity with impunity"; and he "controlled the corporate activities with an 'iron hand.'" *Id.*

The court stated that *any* claim by Wall would be subject to subordination: the court was prepared to "take judicial notice of the record in prior related proceedings, and ... draw reasonable inferences therefrom." *Id.* However, the "full scope of Wall's dealings" could not be imputed to the defendant creditor because the defendant was an "insider" of the debtor only with regard to two transactions. *Id.* Therefore, Wall's misconduct with regard to those two transactions only would be imputed to the defendant. *Id.*

The *Missionary Baptist* court considered two substantially identical transactions. Wall and the defendant creditor conveyed properties they co-owned as partners to the debtor, receiving prices in excess of their fair market value. 48 B.R. at 889–90. The debtor gave notes for the purchase price and made regular payments each month while general unsecured trade creditors often went unpaid. *Id.* at 890. At the filing of the bankruptcy, the unpaid balance owing to the defendant was $119,005.00. *Id.* at 887. Wall's improper self-dealing with the corporation he dominated was imputed to the defendant, who benefitted from the deal to the prejudice of the debtor's general creditors. The court indicated that "[i]t was wrong for Wall to deal with the debtor corporation at all, regardless of whether the corporation profited"; similarly, it was wrong for the defendant to accede to the transactions arranged by his partner. *Id.* at 889–90.

Once Wall's inequitable conduct was imputed to the defendant, thus satisfying the first *Mobile Steel* test, the court proceeded to apply the second and third tests to his conduct. 48 B.R. at 890. The court thought it "apparent" that the defendant gained an unfair advantage and that injury

---

**6.** Alluding to previous litigation involving Claxton, III, see note 3 *supra,* the trustee claimed that Claxton, III "has never stopped orchestrating the activities of others to keep this real property or its proceeds away from the bankruptcy estate and from the creditors of this bankruptcy estate." The Trustee prsented testimony outlining Claxton, III's past improprieties, including his disregard for the independent corporate existences of the business enterprises he controlled, his successful efforts to induce others to invest in a non-producing Bolivian gold mine, his misuse of the funds of others, and criminal conviction and incarceration in federal prison. Walsh freely admitted at trial that he took no action regarding the McLean property without consulting Claxton, III. The trustee implied that any venture in which Claxton, III is involved must necessarily be improper.

had been suffered by creditors because of Wall's inequitable conduct. *Id.* Monies were paid to the defendant that otherwise would have gone to the debtor's trade creditors. *Id.* Additionally, the court found that the third *Mobile Steel* test had been satisfied. The court ruled that equitable subordination of the defendant's claim would not be inconsistent with the provisions of the Bankruptcy Act because it would serve to remedy the unfair and inequitable distribution of the debtor's assets to the defendant while other creditors were not being paid at all. *Id.*

*Missionary Baptist* apparently is the only case in which the inequitable conduct of one person has been imputed to another to allow the claim of another to be equitably subordinated. *Cf. Westgate-California Corp. v. First National Finance Corp.,* 650 F.2d 1040, 1043–44 (9th Cir.1981) (corporate creditor's claim cannot be subordinated solely on basis of principal's inequitable conduct without a finding that principal acted on behalf of creditor or that creditor was principal's alter ego).

The trustee argues that the case *sub judice* requires a result similar to that reached in *Missionary Baptist.* The trustee also urges the court to take judicial notice of the prior related proceedings involving the debtor, Claxton, III, arguing that the series of transactions by which Walsh and others obtained interests in the first trust note are merely a part of Claxton, III's continuing scheme to evade the jurisdiction of this court and deprive his creditors of their just due. Walsh freely concedes that he took no action regarding the property without consulting Claxton, III; in fact, it was Claxton, III who arranged for Walsh's purchase of the first trust note from Mildred Loveridge the previous holder, and it was Claxton, III who helped Walsh decide to file a motion for relief from stay, the success of which would have been the first step in the plans of Walsh and Claxton, III to sell part of the land and use the proceeds to develop the remainder of the property for sale at an enhanced price. The trustee calls Walsh a "mere instrumentality," the latest member of the "network of friends and relatives" that this Court recognized and identified previously as having been organized and exploited by Claxton, III to do his bidding.

It is undisputed that Claxton, III committed improprieties with regard to this property which were the subject of this Court's opinion reported at 30 B.R. 199 (1983). However, the trustee has produced no evidence connecting these past improprieties with any of the debtor's activities in which Walsh also is involved. The trustee did succeed in raising questions about the origin and validity of Bandierante's undocumented interest in the note, and from these questions flows some doubt as to the propriety of the Certificates of Deposit issued by Walsh under authority of his Trust Agreement with Bandierante. However, Claxton, Jr.'s testimony that Bandierante paid $250,000.00 for its share of the note remains uncontroverted. Further, the uncontradicted testimony of Mr. Walsh was that he purchased from Mildred Loveridge that residual share of the note retained by her, suggesting that Mr. Walsh has in good faith believed Bandierante to be the owner of the balance of the note. Thus, despite Claxton, III's documented propensity for deceptive dealing, the trustee has proven no inequitable conduct with respect to Walsh's ownership of the first trust note.

Augmenting the Court's conclusion that the trustee has failed to prove inequitable conduct which may be fairly imputed to the defendant is Walsh's complete candor regarding his relationship and dealings with Claxton, III. Walsh admitted that he and Claxton, III planned to foreclose the first trust, sell a portion of the property and devote the proceeds of the sale to development of an equity in the remaining property. The fact that Claxton, III was instrumental to Walsh's ownership of the note, participated in the plan to gain relief from the stay and crafted a list of creditors to whom he would give priority in payment cannot establish wrongdoing sufficient to taint the ownership of the first trust holder. The situation at bar stands in sharp contrast to that considered by this Court in previous litigation involving this debtor. *See* 30 B.R. 199 (1983).

The trustee would have the Court infer that Claxton, III has acted in accordance with previously shown inequitable propensities in his dealings with Walsh involving the McLean property. Furthermore, the trustee would have the Court impute Claxton's ill intent to Walsh. Imputing an inference of wrongdoing in this manner, based upon the evidence presented in this proceeding, would create too tenuous a basis on which to ground the harsh remedy of equitable subordination. It is one thing to take judicial notice of past proven improprieties by one person and impute them to another person who was involved in those same improper transactions, which was the case in *Missionary Baptist.* Here, the trustee requests that this Court take judicial notice of past improprieties in order to gauge an individual's conduct on a subsequent occasion and, further, impute that inferred intent to another individual. This we must decline to do.

Consequently, the Court cannot find that the first of the *Mobile Steel* conditions has been met in this case. Assuming that Walsh is an "insider" of the debtor within the meaning of the former Bankruptcy Act, he did not attain that status until well after Claxton was adjudicated a bankrupt. He played no role in the transactions leading to the litigation in which this Court found Claxton, III acted with the intent to hinder and delay his creditors. *See Matter of Claxton, supra* note 3. Walsh was not involved in any of the other lawsuits, the cost of which the trustee now seeks to assess to the first trust held by Walsh. He had no claim against the estate at the time of the filing of the petition; indeed, instead of drawing assets away from the estate pre-petition as did the defendant in *Missionary Baptist,* Walsh has expended over $100,000.00 of his own funds post-petition to help pay Claxton, III's creditors and to acquire an interest in the first trust note. The trustee concedes that Walsh himself is without fault, even expressing a willingness to allow him to recoup the funds he has expended. Finally, Walsh is unlike the defendant in *Missionary Baptist,* who had profited and who stood to profit further by his partner's past improprieties.

■ Even if the Court were willing to impute impropriety to Walsh, there is no credible evidence to show that Walsh's transactions met the second *Mobile Steel* condition by causing damage to the creditors of the estate. By becoming the holder of the first trust note, Walsh merely substituted himself for the previous holder. By purchasing an interest in the note, Walsh did not take money out of the hands of unsecured creditors or administrative claimants.[7] It is true that after becoming holder of the note Walsh issued "Certificates of Participation" at Claxton, III's direction, which the trustee asserts operate as preferential payments to some of Claxton, III's creditors. The culprit in those transactions, however, appears to be Bandierante, which claimed but did not document an interest in the first trust note, and which is not a defendant here. Walsh's issuance of the certificates did not alter the nature of the note or the amount due from the estate and therefore could not reduce the amount available for distribution to creditors.

The reason that the estate has no funds with which to pay unsecured claimants is that delays in administering the estate have diminished the equity in the McLean property. The trustee places the blame for these delays on "nearly ten separate pieces of litigation" coordinated by Claxton, III from his federal prison cell in Petersburg, Virginia. Claxton, III cannot deny at least partial responsibility for the protracted administration of this case but it is difficult to see how Walsh could have contributed to the delay. He had no part in the lawsuits

---

7. John F. Baringer, former president of Bandierante, testified that he believed that $69,-000.00 of principal had been paid on the first trust note. Walsh claims the full face amount of the note plus interest. Baringer based his testimony on a reading of a letter prepared by Claxton, III but no receipt or other record of this alleged payment was offered into evidence. Baringer's testimony does not prove that a $69,-000.00 payment was made. Moreover, it does not show that Walsh purchased the note with knowledge that such a payment had been made or that he attempted to conceal the fact after becoming holder of the note.

referred to by the trustee and his involvement in the relief from stay action he filed is not alleged to have delayed or complicated the eventual sale of the property.

 To hold Walsh responsible for inequitable conduct occurring prior to his involvement in the case would be inconsistent with the Bankruptcy Act. Consequently, the third and final criterion of the *Mobile Steel* test cannot be met. An insider or other fiduciary need not prove the validity and honesty of his claim against a debtor's bankruptcy estate solely because of his relationship with the debtor. It is only after the trustee establishes a "substantial factual basis" for his allegation of impropriety that the burden shifts to the insider to come forward with evidence to justify his claim. *Mobile Steel, supra,* 563 F.2d at 701. The trustee's factual burden cannot be met with mere inferences, as has been attempted here. In addition, the claim being objected to here is not a general unsecured debt but a claim secured by a recorded first deed of trust. The court in *In re Featherworks Corp.,* 25 B.R. 634, 649 (Bankr.E.D.N.Y.1982) refused to equitably subordinate a first lien on the debtor's assets when the only evidence of inequitable conduct was a "vague statement" made by a witness that the claimant had charged the debtor higher prices for its merchandise than it charged other customers. Observing that "[e]quitable subordination is a harsh remedy," the court held that the evidence lacked "the specificity the courts have required for equitable subordination." 25 B.R. at 649. Similarly, the evidence in the case at hand is less than concrete. The trustee has done little more than to raise the specter of impropriety. More than that is required for equitable subordination.

 Like other forms of equitable relief, equitable subordination in bankruptcy is not to be invoked lightly. *In re Tinsley and Groom,* 49 B.R. 85, 90 (Bankr.W.D.Ky. 1984). A valid lien cannot be set aside solely in order to pay unsecured creditors who seem to be more deserving of a distribution from the lienholder. *See In re Bellucci,* 24 B.R. 493 (Bankr.D.Mass.1982) (in an involuntary bankruptcy filed against an ex-attorney who had misused over $500,-000.00 of his clients' funds, the court refused to subordinate the Internal Revenue Service's tax lien despite the "unfortunate results" which would be suffered by the clients: "it is not within the province of the court to fashion the Bankruptcy Code to meet the facts and needs of the particular case before it" absent the traditional grounds for equitable subordination).

 It is regrettable that without subordination there will be no funds in the estate with which to satisfy unsecured creditors and the administrative claims of the trustee and trustee's counsel for their diligent services in this protracted and difficult case. Nevertheless, it is not the responsibility of the secured creditors to pay the administrative expenses of the estate. *In re Bob Grissett Golf Shoppes, Inc.,* 50 B.R. 598, 602 (Bankr.E.D.Va.1985). This Court has stated that "[t]he fact that the estate has no unencumbered assets from which to pay administrative expenses does not obligate a secured creditor to fund these expenses" unless the expenses benefitted the creditor in some significant way or the creditor consented to the charges. *Bob Grissett, supra,* 50 B.R. at 602. Neither benefit nor consent is present here.

An appropriate order will enter.